UNITED STATES OF AMERICA
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | Case No. 15 CR 189 |
| v. | ) | |
| | ) | Judge Amy J. St. Eve |
| | ) | |
| GREGORY SALVI | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorney, Joel R. Levin, Acting United States Attorney for the Northern District of Illinois, respectfully submits this memorandum in advance of the sentencing of defendant Gregory Salvi. For the reasons set forth herein, the government respectfully requests that the Court sentence defendant to a term of imprisonment within the advisory Guidelines range of 87 to 108 months' imprisonment for Count One of the superseding information, followed by a consecutive term of 60 months' imprisonment on Count Two.

## I.    INTRODUCTION

Defendant Gregory Salvi was a Melrose Park Police Department detective who abused his power as a police officer to both distribute narcotics, including cocaine and heroin, and to attempt to help narcotics traffickers transport kilogram quantities of cocaine into the Chicago area. Defendant now stands before the Court appropriately stripped of his police powers and a felon, who has pleaded guilty to Count One of the superseding information, charging attempted possession with intent to distribute in excess of 500 grams of cocaine, in violation of 21 U.S.C. § 846,

and Count Two, charging possession of a firearm in furtherance of that drug trafficking offense, in violation of 18 U.S.C. § 924(c).

There is no question that defendant's actions were a disgrace to his police department and a significant breach of the public trust (both at a personal and a larger community-wide level). Defendant was not the victim of a momentary lapse of judgment, nor was he coerced or squeezed into committing crime. Through the very dangerous and poisonous criminal activity Salvi consciously chose to commit, which occurred over a significant and extended period of time (at least in excess of eight months), defendant has earned his place in prison: the Court is well within its discretion to sentence him within the advisory Guidelines range of 87 to 108 months' imprisonment on Count One, with a consecutive sentence of 60 months' imprisonment on Count Two.

Defendant's sentencing memorandum, *see* R. 69, seeks to minimize his involvement in criminal activity by attempting to push the blame to law enforcement and cooperating individuals for their allegedly outrageous efforts to investigate a corrupt and dangerous police detective who was distributing cocaine stolen from his police department. Defendant's memorandum not only jeopardizes his claimed acceptance of responsibility, but it also reflects a fundamental misunderstanding of the facts and crimes that led to the government's identification of Salvi as a police detective turned narcotics trafficker.

As defendant himself had to acknowledge in his plea agreement, in the spring of 2014 (before defendant was on the FBI's radar), defendant got his corrupt hands

on a kilogram of cocaine that the Melrose Park Police Department seized during one of its investigations. *See* R. 65 at 3. With blatant disregard for the possible consequences his criminal activity may have had on the department's ongoing narcotics investigation, defendant saw the kilogram of cocaine as an opportunity for personal gain. He planned to take the stolen kilogram of cocaine, sell it, and keep the proceeds for himself. *See id.*

After obtaining the stolen kilogram of cocaine, defendant then sold that kilogram of cocaine to his friend, putting those dangerous drugs back into circulation after they had been lawfully seized by the police. After selling the kilogram of cocaine, Salvi had no problem discussing how he profited from the deal during a recorded conversations with the CSs on June 18, 2014, saying, "I got rid of it, I sold it for fifty bucks a gram, I was good." Salvi also made it clear that this was not the first time that he had taken lawfully seized narcotics from the police department for his own personal gain: "This is exactly like that forty pounds I gave [naming a marijuana trafficker, identified here as Trafficker A]. When I gave [Trafficker A] those forty pounds, the big stock buds, [Trafficker A] went fuckin' nuts for those. And that was all from that [unintelligible] thing. Here's what they did.  They gave me the van and said go to the incinerary [sic] and burn this forty pounds and make [unintelligible] smell. [Unintelligible] right to Elmhurst, right to [Trafficker A's] house. I said, 'Here's forty pounds.  I need two grand a pound.'  He goes, 'Done. Have it tomorrow for you.'" Salvi later explained that he was not only in the business of taking narcotics from evidence for his own personal gain, but also he

obtained tools seized by the police, boasting about how had a generator, a compressor, and "tons of power tools, I don't even fuckin' use half of them."

During that same conversation in June 2014, Salvi also discussed how he helped Trafficker A by committing a fake arrest of one of Trafficker A's associates, interrupting a drug deal and allowing Trafficker A's associate to walk away with narcotics without having to pay the suppliers. Specifically, Salvi stated, "Fifteen minutes later we go in my, my squad goes in the garage, nobody sees it. My windows in my squad are as dark as my Charger. He [Trafficker A's associate] gets in the back, in the car with me again, me and him pull out, we leave and I go take him somewhere. This way he's not ever walking out the front door, nobody ever sees him walk out the front door. I don't mind. He can come with me to the station. Listen, if you talk to [Traffikcer A], I would tell you to ask him, because we've done this before. OK. I've done this, I've done it with him before, I gave the guy a ride to the station in cuffs, OK, back of the cuffs, uncuffed him in the car 'cuz nobody could see it. We close the garage door, we got out, walked upstairs, went upstairs, we had a Coke, we watched some TV, came down, got him in the car, drove him to Elmhurst, dropped his ass off and we're all done."

It was against this backdrop of defendant's blatantly criminal and dangerous activity—who held a ranking position with his local police department as a detective—that the FBI initiated its investigation into Salvi. As part of the investigation in August 2014, as defendant acknowledges, the CSs provided Salvi with information about a purported narcotics trafficker who would be driving

through Melrose Park with drug proceeds. Defendant has conceded that he acted on that information in an effort to steal the narcotics trafficker's money by performing a traffic stop of the believed narcotics trafficker, though other officers (uninvolved in Salvi's criminality, to the government's knowledge) who were in the area also responded and Salvi did not have the opportunity to steal the money for himself. *See* R. 69 at 3. Salvi has seized on this incident to suggest that because of this botched traffic stop the FBI decided to pursue him "exhaustively and forcefully", leading to Salvi being "scared" and having feelings of "desperation." R. 69 at 4.

The evidence belies Salvi's arguments and claimed entrapment. Defendant's conversations that continued from September 2014 through to April 2015 demonstrate that Salvi was bent on coming up with other schemes for him to make money to the disadvantage of his police department. For instance on November 24, 2014, during a recorded in-person conversation, Salvi discussed how he had sold six ounces of cocaine to a "kid"—not the CSs—for $4,800. *See* R. 1 at ¶12. If Salvi was so desperate to make amends for the botched traffic stop, why talk to the CSs about a drug deal that netted him several thousand dollars in pure profit?

Far from being entrapped, Salvi was predisposed to commit criminal activity as his sale of the kilogram of cocaine in the Spring of 2014 demonstrated, as did his conversations about providing 40 pounds of marijuana to Trafficker A. Moreover, Salvi's agenda was blatant and obvious. Salvi how his objective was pure greed: "I got fuckin three months left in the police department. Okay? I'm trying to make whatever I can." *Id.* at ¶89. Making whatever money Salvi could was clear, as he

expressed willingness to sell firearms with obliterated serial numbers to narcotics traffickers, offered to rob his secondary place of employment, and was actively distributing heroin and cocaine that had been stolen from the department's evidence room.

Simply put, Salvi's efforts in his sentencing memorandum to minimize his involvement in blatantly criminal and egregious behavior—made to the Court while he knows he has been caught—stand in stark contrast to the unequivocal and shockingly brazen statements Salvi made from November 2014 to April 2015 about his criminality—at a time when he had no idea that he was being recorded.

It would have been troubling (and criminal) enough had Salvi been a private citizen bent on greed and personal gain who turned to narcotics trafficking to commit his crimes, but Salvi was in a position to know better, not only because of his personal circumstances, but also because he was a police detective. To begin with, as reflected in the PSR, Salvi has at least one close relative who battled drug addiction. Salvi has been exposed to the fallout from that individual's addiction and has firsthand knowledge of how destructive a drug addiction can be and even tear apart the fabric of family. This makes his decision to turn to narcotics trafficking as a source of income all the more shocking and reprehensible.

Likewise, Salvi was and has been a police officer for years and he surely knows full well how destructive and dangerous narcotics trafficking is to families and the community. Adding insult to injury, Salvi did not simply engage in criminal activity on his off hours. Instead, Salvi was an officer who *actively* abused his

position as a police officer to make his criminal activity succeed, from obtaining narcotics stolen from the police department, to using police vehicles for his narcotics related activity, to carrying his police weapon with him during narcotics trafficking, and even meeting with narcotics traffickers while on duty as an officer. *See* R. 1 at ¶91 (Salvi wanted to do the delivery while on duty: "I prefer the week day because then I'm working."); *id.* at ¶99 (Salvi was going to rely on and take advantage of his position as a police officer. Salvi said he was going to use a car with "M" plates and would be wearing his police vest).

Salvi not only breached the trust that his local police department gave him when he swore to uphold and protect the law, but he also breached the community's trust in him as an officer and in his local police community. It is no surprise that Salvi's criminal activity resulted in press coverage, which reflected poorly on Salvi and also identified his local police department. As Salvi knows or should know, the community expects its police officers, at a minimum, to follow the law that officers enforce. When a police officer goes so far beyond the pale of the law as to engage in high-stakes narcotics trafficking like Salvi did, he imperils the community's trust in local police departments everywhere and creates the very real risk that his actions as the "bad apple" at his local police department pollute the efforts of law-abiding and upstanding officers elsewhere.

## II. Sentencing Considerations under 18 U.S.C. § 3553(a)

The Supreme Court has instructed, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range . . . [T]he district judge should then consider all of the § 3553(a) factors to determine

whether they support the sentence requested by a party." *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

A key § 3553(a) factor remains the applicable Guidelines range, any pertinent policy statements issued by the Sentencing Commission, and "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(4), (a)(5), (a)(6). Moreover, although the Guidelines are merely advisory, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 49. In this case, the advisory Guidelines range for Count One is 87 to 108 months' imprisonment, with a consecutive sentence of 60 months' imprisonment on Count Two.

In terms of mitigation due to personal characteristics, Salvi's personal history reflects that he does not have any arrests, let alone convictions, and this will mark his first criminal conviction. Likewise, Salvi has parents, a wife, and children, all of whom will have to suffer the consequences of his removal from their lives because of Salvi's conscious decisions to engage in criminal activity. Unfortunately, as the Court is well aware, most if not all defendants that the Court faces also have families who feel the impact of a defendant's conviction and sentence. But most defendants do not have the opportunities this defendant had—a stable and loving family for support throughout his formative years, a well-paying career of his own, and a spouse with a career of her own. Nothing in defendant's background justifies or explains why he chose to engage in narcotics trafficking, other than pure greed and desire for personal gain.

The government disagrees with Salvi's suggestion that he "fully cooperated with law enforcement authorities" both since the time of his arrest and throughout these pending proceedings. R. 69 at 6. When Salvi was arrested in April 2015 following his attempted possession of five kilograms of cocaine, he waived *Miranda* and agreed to be interviewed by law enforcement. During that interview, Salvi admitted his personal involvement in criminal activity, but when asked about the stolen kilogram of cocaine from the Spring of 2014, he lied when discussing the distribution of that cocaine and the identity of the person to whom he distributed the cocaine. Then, during a proffer with the government following his arrest and charges while his lawyer was present, Salvi again lied to the undersigned AUSA and FBI agents about what he did with the stolen kilogram of cocaine. It was only after he was confronted again during a later proffer that Salvi acknowledged what occurred during the sale of the stolen kilogram of cocaine. This repeated lack of candor by Salvi—who as a police officer should have known that complete truthfulness is necessary of a cooperating witness—undermined any effort by Salvi to cooperate, as he was unwilling to acknowledge the full scope of his criminal activity despite being given the opportunity to do so.

In terms of the seriousness of the offense and the need to promote respect for the law, there is no question that narcotics trafficking is "a serious crime having a detrimental impact on the community." *United States v. Hayden*, 775 F.3d 847, 850 (7th Cir. 2015). As the Court is undoubtedly well aware, drug trafficking creates very serious harms for the community—including drug addiction, poverty, violence and

crimes by drug users to obtain money to pay for drugs, along with violence and crimes by drug dealers to protect their territory. When armed police officers become involved in this criminal activity, it further endangers the community and creates additional risks. This is particularly true when the police officer (like Salvi) *takes* seized drugs and attempts to reintroduce those drugs in the stream of addition, violence, and depravity, further perpetuating the cycle of crime that he was charged with preventing as a police officer.

In terms of deterrence, there is no doubt that defendant will be deterred from further criminal activity through this conviction and sentence, though his efforts at minimizing his criminal behavior call that into serious question. But this case is not just about specific deterrence, it is about general deterrence. Sentencing Salvi within the Guidelines range sends a message to corrupt law enforcement officers that they will be judged just as harshly and with just as vigor as any other drug trafficker, with no breaks afforded because of their position. Put differently, a corrupt police officer's badge cannot be a shield from prosecution and sentencing to the fullest extent of the law, as there should be no tolerance for police officers who engage in narcotics trafficking.

## III. CONCLUSION

The government respectfully requests that the Court sentence defendant Gregory Salvi within the advisory Guidelines range of 87 to 108 months' imprisonment on Count One of the superseding information, with a consecutive sentence of 60 months' imprisonment on Count Two.

Respectfully submitted,

JOEL R. LEVIN
Acting United States Attorney

By:    s/ *Patrick M. Otlewski*
        PATRICK M. OTLEWSKI
        NICOLE KIM
        Assistant U.S. Attorneys
        219 South Dearborn Street, Room 500
        Chicago, IL 60604
        (312) 353-5300

Dated: July 12, 2017